UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

BARBARA L.,

Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security Administration,

Defendant.

Case No.:  19cv2154-RBB

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, REVERSAL OR REMAND OF COMMISSIONER'S ADMINISTRATIVE DECISION [ECF NOS. 11, 12] AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [ECF NO. 14]**

On November 8, 2019, Plaintiff Barbara L.[1] commenced this action against

Defendant Andrew M. Saul, Commissioner of Social Security Administration, for

judicial review under 42 U.S.C. § 405(g) of a final adverse decision for disability

---

[1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

insurance benefits [ECF No. 1].  On November 19, 2019, Plaintiff consented to the jurisdiction of Magistrate Judge Ruben B. Brooks [ECF No. 4].[2]  Defendant filed the Administrative Record on January 17, 2020 [ECF No. 8].  On February 21, 2020, Plaintiff filed a motion for summary judgment, reversal or remand [ECF Nos. 11, 12].  Defendant filed a cross-motion for summary judgment and opposition to Plaintiff's motion on March 26, 2020 [ECF Nos. 13, 14].  Plaintiff filed an opposition to Defendant's cross-motion and reply to Defendant's opposition on May 15, 2020 [ECF No. 20].

For the following reasons, Plaintiff's motion for summary judgment, reversal or remand is **GRANTED**; Defendant's cross-motion for summary judgment is **DENIED**; and the case is **REMANDED** for further proceedings.

## I.      BACKGROUND

Plaintiff was born on June 8, 1964, has a twelfth grade education, and worked as an attendance technician for Sweetwater Union High School District from 1990 to 2016. (Admin. R. 145, 198-99, 214, ECF No. 8.)[3]  On March 24, 2016, Barbara L. filed an application for disability insurance benefits under Title II of the Social Security Act.  (Id. at 145-46.)  She alleged that she had been disabled since August 15, 2014, due to the cervical radiculopathy, headaches, neck pain, right shoulder and back pain, right epicondylitis (an elbow condition), right De Quervain (a wrist condition), and depression. (Id. at 54-55, 230.)  Her application was denied on initial review and again on reconsideration.  (Id. at 85-88, 94-99.)  An administrative hearing was conducted on May

---

[2] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in cases of this nature.

[3] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

21, 2018, by Administrative Law Judge ("ALJ") Mark B. Greenberg; on October 11, 2018, he determined that Plaintiff was not disabled.  (Id. at 19-27.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration denied the request for review on October 21, 2019.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## A.     Medical Evidence

Plaintiff, during her employment as a school attendance technician, filed a worker's compensation claim with an injury date of April 23, 2014, due to neck and right upper extremity symptoms resulting from repetitive job duties and overuse.  (Id. at 375, 839.)[4]  On August 15, 2014, Zerla Cruz, P.A.-C of Occupational Health Services at Sharp Rees-Stealy Medical Centers, under the supervision of Michael D. Hughes, M.D., provided diagnoses of cervical myofascial strain, thoracic myofascial strain, right lateral epicondylitis, De Quervain's tenosynovitis on the right, and right carpal tunnel syndrome.  (Id. at 571.)[5]  Ms. Cruz placed Plaintiff on modified duty at work.  (Id.)  Electrodiagnostic testing performed on October 6, 2014, by Charles J. Jablecki, M.D., showed chronic and abnormal "neuropathic changes in muscles," and electromyography ("EMG") findings were compatible with a chronic right C6-7 radiculopathy.  (Id. at 295-96, 533.)  On November 12, 2014, Dr. William Wilson, a pain management specialist, examined Plaintiff and concluded that Dr. Jablecki's findings of cervical radiculopathy had "diminished significance" because Barbara L.'s right upper extremity symptoms had improved.  (Id. at 534-35.)

---

[4] Plaintiff's job duties included data processing, typing, and filing.  (Admin. R. 199, ECF No. 8.)
[5] Lateral epicondylitis, also known as "tennis elbow," occurs when the tendons in the elbow are overloaded, usually by repetitive motions of the wrist and arm.  See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/tennis-elbow/symptoms-causes/syc-20351987 (last visited Oct. 15, 2020).  De Quervain's tenosynovitis is a condition affecting the tendons on the thumb side of the wrist.  See id., https://www.mayoclinic.org/diseases-conditions/de-quervains-tenosynovitis/symptoms-causes/syc-20371332 (last visited Oct. 15, 2020).

3

1    On February 9 and March 19, 2015, Plaintiff consulted with Dr. L. Randall Mohler

2   of the California Orthopaedic Institute regarding the symptoms in her right upper

3   extremity.  (Id. at 375-76, 381-82.)  She explained that she had discontinued physical

4   therapy after not tolerating it well; completed eighteen acupuncture sessions with only

5   limited improvement; and received elbow, wrist, and neck injections and a

6   radiofrequency procedure without substantial improvement.  (Id. at 375.)  Dr. Mohler

7   ordered a cervical MRI that did not reveal any significant findings.  (Id. at 382, 383-84.)

8   Dr. Mohler concluded that upper extremity surgery would not be beneficial, and he

9   declined to recommend MRI imaging of Plaintiff's elbow or wrist because he had "no

10  reasonable expectation of identifying a treatable source of [her] symptoms."  (Id.)

11  Around the same time, on February 18 and March 17, 2015, Barbara L. was evaluated by

12  Dr. William Tontz, Jr., M.D., also with the California Orthopaedic Institute, regarding her

13  neck symptoms.  (Id. at 373-74, 377-80.)  Dr. Tontz's diagnostic impression was cervical

14  strain with mild C6-7 radiculopathy.  (Id. at 379.)  The physician opined that Plaintiff did

15  not need neck surgery.  (Id. at 374, 380.)

16    Plaintiff returned to Occupational Health Services at Sharp Rees-Stealy on April 2,

17  2015, and was seen again by Ms. Cruz, the physician assistant.  (Id. at 767-68.)  Barbara

18  L. reported that she was still experiencing pain in her neck, right elbow, and right wrist.

19  (Id. at 767.)  She related that Dr. Tontz had no recommendations for her neck other than

20  obtaining vocational training, and that she was not satisfied with Dr. Mohler's

21  examination of her right elbow and wrist.  (Id.)  Ms. Cruz adjusted Plaintiff's modified

22  work duty status to restrict the use of her right upper extremity and suggested a second

23  orthopedic opinion regarding her right arm.  (Id.)  On May 19, 2015, Dr. Alon A. Garay,

24  an orthopedic surgeon with Sharp Rees-Stealy, recommended that Barbara L. proceed

25  with surgery, consisting of right wrist De Quervain tenovaginotomy, right elbow lateral

26  epicondylectomy, and release of the extensor carpi radialis brevis, because conservative

27

28

4

1   medical measures had not alleviated her symptoms.  (Id. at 520-24.)  The surgery was

2   performed on July 31, 2015.  (Id. at 514-15.)

3       On September 16, 2015, Barbara L. told Dr. Garay that she was doing well post-

4   surgery, had been discharged from occupational therapy, and felt ready for a home

5   exercise program.  (Id. at 714-16.)  Dr. Garay noted that Plaintiff was able to work on a

6   modified duty status and recommended limited use of her right upper extremity.  (Id. at

7   715.)  The following month, on October 30, 2015, the doctor determined that Plaintiff

8   could return to work for a trial of full duty.  (Id. at 502-04.)  He advised Barbara L. to

9   follow up with Ms. Cruz for evaluation of her cervical radiculopathy, which Plaintiff

10  believed was causing diffuse numbness in her right hand.  (Id. at 502-03.)

11      On October 28, 2015, Dr. Bijan Zardouz, a neurologist, conducted a Qualified

12  Medical Evaluation, including an extensive record review, on behalf of Plaintiff's

13  worker's compensation carrier.  (Id. at 683-711.)  Barbara L. told Dr. Zardouz that she

14  had constant sharp pain on the right side of her neck and right shoulder; weakness in her

15  neck and right shoulder; intermittent slight pain in her right hand, right wrist, and right

16  elbow; constant numbness in the fingertips on her right hand; and headache on the right

17  side of her head that traveled to her right eye.  (Id. at 685.)  Dr. Zardouz concluded that

18  Plaintiff was neurologically stable and there was no evidence of any focal neurological

19  deficit.  (Id. at 707.)  He opined that Barbara L. should be precluded from neck flexion

20  for more than four hours in an eight-hour shift.  (Id. at 708.)[6]  He deferred any opinion

21  regarding Plaintiff's right elbow and right wrist to an orthopedic surgeon.  (Id. at 709.)

22  With respect to Barbara L.'s future medical care, Dr. Zardouz recommended over-the-

23  counter analgesics and prescription medications as needed for headache relief.  (Id.)  Dr.

24

25

26  [6] Neck flexion is the act of bringing the chin down toward the chest.  See Healthline,

27  https://www.healthline.com/health/neck-flexion (last visited Oct. 15, 2020).

28                                                                          19cv2154-RBB

1    Zardouz reiterated his opinion in a supplemental report dated December 21, 2015.  (Id. at

2    678-80.)

3         Plaintiff followed up with Zerla Cruz, the physician assistant in the Occupational

4    Health Clinic at Sharp Rees-Stealy, on December 11, 2015.  (Id. at 435-36.)  Barbara L.

5    stated that her right wrist and elbow had been doing better since surgery, and her primary

6    concern was her neck.  (Id. at 435.)  She described the severity of her neck pain as a

7    seven on a scale of ten and explained that the pain radiated into her right shoulder.  (Id.)

8    Ms. Cruz noted that Plaintiff had hypertrophy on the right side of her cervical

9    musculature, which was tender to palpation, and her cervical range of motion was slightly

10   restricted and stiff.  (Id.)  Plaintiff expressed a desire to return to a pain management

11   specialist regarding her neck.  (Id. at 436.)  Four days later, Barbara L. came into the

12   Occupational Health Clinic on a walk-in basis and was seen by Dr. Robert D. Power in

13   Ms. Cruz's absence.  (Id. at 437-38.)  Plaintiff complained that her neck pain had

14   worsened due to an increased workload, which included typing for sixty to ninety

15   minutes at a time.  (Id. at 437.)  Dr. Power placed Plaintiff on modified duty requiring

16   neck stretch breaks for ten minutes every hour and the avoidance of prolonged neck

17   flexion, extension, or twisting.  (Id. at 438.)  On January 5, 2016, Plaintiff reported to Ms.

18   Cruz that notwithstanding the work restrictions recommended by her medical providers,

19   she was still performing the same duties at work, including typing and writing.  (Id. at

20   439-40.)  Since returning to work, her neck pain had increased and she had developed

21   numbness in her right arm.  (Id. at 439.)  She expressed that she could not handle the

22   workload and that the typing was "too much."  (Id.)  The physician assistant modified

23   Barbara L.'s work duty status to exclude any typing.  (Id. at 440.)  Despite the

24   elimination of typing from her job duties, Plaintiff presented to Ms. Cruz's office with

25   "severe" pain on January 12, 2016, leading Ms. Cruz to prescribe Tramadol and place

26   Plaintiff off work for three days.  (Id. at 441-42.)

27

28

Dr. Robert E. Scott, Jr., in the Physical Medicine and Rehabilitation Department at Sharp Rees-Stealy, evaluated Plaintiff on February 2, 2016. (Id. at 497-501.) Plaintiff told Dr. Scott that her surgeries had not provided full relief. (Id. at 497.) She rated her pain level as six on a scale of ten behind her right neck and shoulder and four out of ten in her other areas, including her upper back, elbow, and wrist. (Id. at 498.) Dr. Scott administered trigger point injections to her cervical and trapezial region and recommended a home exercise program. (Id. at 499-500.) He also expressed that Plaintiff's symptoms would likely persist as long as she was "exposed to the aggravating environment." (Id. at 499.) The trigger point injections initially alleviated Barbara L.'s symptoms, but her symptoms became more severe, so she went to the emergency room on February 7, 2016, and followed up with Dr. Power in the Occupational Health Clinic on February 8, 2016. (Id. at 428-30, 443-44.) Dr. Power felt that Plaintiff's ongoing pain was due to her cervical radiculopathy, and she needed to consult with an orthopedic surgeon or chronic pain management specialist. (Id. at 444.) The following month, Dr. Power completed a disability report in which he indicated that Plaintiff was incapacitated from performing fine manipulations and using her right hand in a repetitive manner. (Id. at 450-51.)

On March 8, 2016, Dr. Scott, the physical medicine physician, decided that further trigger point injections were not justified because they had not adequately helped Plaintiff's symptoms; he had no further treatment recommendations. (Id. at 493-96.) The physician found that Barbara L.'s cervical motion was fifty percent impaired in right rotation and lateralization, and her neck condition was permanent and stationary. (Id. at 494, 495.) With respect to Plaintiff's work status, he stated that a trial of full duty might be indicated because Plaintiff was likely to lose her job if she was maintained on modified duty. (Id. at 495.) In contrast to Dr. Power, he did not find evidence of radiculopathy. (Id.)

1    Plaintiff received a consultation from Jean-Jacques Abitbol, M.D., an orthopedic

2  surgeon, on March 23, 2016.  (Id. at 651-55.)  His examination revealed normal cervical

3  range of motion.  (Id. at 653.)  Dr. Abitbol concluded Plaintiff's cervical MRI was

4  essentially within normal limits and consistent with her age.  (Id. at 655.)  He found

5  "absolutely no evidence of ongoing stenosis or evidence clinically supporting radicular

6  pain" and stated that the EMG results supported his opinion that Barbara L.'s symptoms

7  were nonradicular in nature.  (Id.)  He did not believe Barbara L. required any surgical

8  intervention and suggested that a home exercise program and a TENS unit would be

9  sufficient to address her symptoms.  (Id.)[7]

10    On April 4, 2016, Plaintiff informed Dr. Power that she had been laid off from her

11  job and was planning to seek medical retirement.  (Id. at 445; see also id. at 491, 897.)[8]

12  Dr. Power advised Barbara L. that she needed to transition to another physician for

13  chronic pain management.  (Id. at 445.)  He also renewed her prescription for Gabapentin

14  and placed her on permanent modified work status, consisting of four-hour work days;

15  four-hour limitation on keyboarding; limited push, pull, grasp, and torque with the right

16  upper extremity; no overhead work; and avoid prolonged neck posture in a flexed,

17  extended, or twisted position.  (Id. at 491, 897.)

18    On May 26, 2016, state agency physician Pamela Ombres, M.D., found that

19  Plaintiff had the residual functional capacity to perform light work.  (Id. at 63-67.)  Dr.

20  Ombres concluded that Plaintiff had no push or pull limitations, could only reach

---

[7] A transcutaneous electrical nerve stimulation (TENS) unit is a device that sends small electrical currents to targeted body parts to help relieve pain.  See Healthline, https://www.healthline.com/health/transcutaneous-electrical-nerve-stimulation-unit(last visited Oct. 15, 2020).

[8] The medical notes located on pages 445 and 491 of the administrative record, when viewed separately, are incomplete, but viewing these pages together and in conjunction with Dr. Milling's medical record review, (see Admin. R. 897, ECF No. 8), makes it clear that the records were generated in connection with Plaintiff's office visit with Dr. Power on April 4, 2016.  (See id. at 445, 491, 897.)

overhead with both upper extremities on a limited basis, and had an unlimited capacity for handling, fingering, and feeling.  (Id. at 64-65.)  On November 3, 2016, another state agency physician, Joel Ross, M.D., agreed that Barbara L. retained the residual functional capacity for light work.  (Id. at 79-82.)  In his opinion, however, Plaintiff could only push or pull frequently with her right upper extremity; reach in front, laterally, or overhead with her right upper extremity frequently; perform handling on the right frequently; and perform fingering and feeling on an unlimited basis.  (Id. at 79-81.)[9]

On March 2, 2017, Dr. Paul C. Milling, an orthopedic surgeon, conducted a Qualified Medical Evaluation of Plaintiff in connection with her worker's compensation claim.  (Id. at 868-78.)  Barbara L. continued to complain of constant neck pain radiating into the right side of her head and right shoulder blade, and down her right arm to her right hand and fingers.  (Id. at 868.)  She stated that her right wrist and elbow improved considerably following the surgeries performed by Dr. Garay, but she had not experienced full improvement.  (Id. at 870.)  Dr. Milling's examination revealed generalized tenderness of the cervical spine and trapezius muscles but full range of motion of the neck without muscle spasm.  (Id. at 873.)  The physician concluded that Plaintiff could not return to her usual work and that vocational rehabilitation was indicated.  (Id. at 877.)  He included work restrictions:  Barbara L. should avoid repeated forceful grasping, twisting, and torqueing with her right upper extremity, as well as repetitive sustained work above the shoulder level due to her neck.  (Id.)  Dr. Milling provided supplemental reports on April 3, May 5, and June 26, 2017, but his conclusions remained unchanged.  (Id. at 880-912.)

---

[9] In Social Security cases, "frequently" is defined as occurring from one-third to two-thirds of the workday.  SSR 83-15, 1983 WL 31251, at *6 (Jan. 1, 1983).

Barbara L. received a pain management consultation from Dr. Javid Ghandehari with Advanced Orthopedic Center on May 23, 2017.  (Id. at 1003-07.)  On physical examination, Plaintiff's "[c]ervical flexion was decreased to [thirty] degrees before having pain, extension less than [five] degrees."  (Id. at 1005.)  Dr. Ghandehari's diagnostic impression was chronic cervical radicular pain with co-morbidities of anxiety and depression.  (Id.)  He increased Plaintiff's dose of Gabapentin; prescribed physical therapy, acupuncture, manual therapy, and massage therapy; and referred Plaintiff to psychotherapy.  (Id. at 1006.)  During follow-up visits on August 8, and September 26, 2017, Dr. Ghandehari also prescribed Diclofenac gel, which helped Plaintiff's symptoms, and increased the dosage of Gabapentin.  (Id. at 1050, 1052, 1149-50.)  On both occasions, he deferred any opinion on Barbara L.'s work status to her treating physician. (Id. at 1052, 1151.)

On January 16, 2018, Plaintiff reported to Laurie Benton, P.A., of Kaiser Permanente, that she was retired due to chronic neck and shoulder pain, and was experiencing worsening left elbow pain.  (Id. at 1687.)  On March 26, 2018, Barbara L. saw Joanna Gunn, M.D., at Kaiser, and complained that she had been experiencing neck, shoulder, and upper back pain for the past six months.  (Id. at 1698.)  She explained that she had neck and arm symptoms "on and off" and pursued a worker's compensation claim three years earlier.  (Id. at 1699.)  The pain was "different now" because it felt more like a muscle strain and was more severe than she had been experiencing.  (Id.) Plaintiff denied arm pain, numbness, tingling, or weakness.  (Id.)

**B.**   **Hearing Testimony**

 **1.**    **Plaintiff's testimony**

On May 21, 2018, Barbara L. appeared with her attorney at a hearing before ALJ Greenberg.  (Id. at 33.)  She testified that her work as an attendance technician required data entry using a computer keyboard and mouse for eight hours a day.  (Id. at 37-38.)

1    She became disabled from working in this position on August 15, 2014.  (Id. at 36.)  On

2    several occasions over the course of the next year, she tried to return to limited duty

3    work, which involved answering phones and directing parents and personnel, but was

4    only able to last a week or two each time.  (Id. at 36-39.)  She then attempted to return to

5    limited duty work on a part-time basis, twenty hours a week, but could not continue due

6    to unbearable pain.  (Id. at 39.)  Plaintiff explained that she was unable to perform her job

7    because "[p]hysically, my head feels really heavy[,]" and she had spasms and pain that

8    moved into her ear, temple, and eye, down her arm, and into her hand.  (Id. at 40.)

9            Barbara L. stated that she experienced spasms and pain whether she was sitting or

10   standing.  (Id.)  She described being physically uncomfortable while providing her

11   hearing testimony, and when she experienced that discomfort, she needed to lie down and

12   rest her head "to take the weight off my neck."  (Id. at 41-42.)  She took medications that

13   helped with her pain but made her feel lethargic when she performed even simple tasks.

14   (Id. at 42.)  Plaintiff stated that she did not sleep well because of her pain.  (Id. at 42-43.)

15   She was able to perform light household chores such as laundry and dishes with her

16   husband's assistance.  (Id. at 43-44.)  She did not do much cooking because she had

17   numbness in her right hand.  (Id. at 44.)  Barbara L. was able to go grocery shopping but

18   lifted heavy items with her left hand.  (Id.)  She was able to drive but used mirrors instead

19   of turning her head.  (Id.)  She testified that she could not sit, stand, or walk for more than

20   an hour because she started feeling discomfort in her neck.  (Id. at 45, 48.)  She needed to

21   lie down every day for a couple of hours until her pain subsided.  (Id. at 45-46.)  Barbara

22   L. stated that her pain management doctor told her that she would have to learn to live

23   with her pain and that he could only prescribe medications.  (Id. at 46-47.)  She was

24   unable to write, garden, ride her bike, or ride horses.  (Id. at 48-49.)

25   / / /

26   / / /

27

28

### 2.      Vocational expert's testimony

Vocational expert ("VE") Victoria Rei also testified at the hearing.  (Id. at 33.)
Judge Greenberg asked the VE to assume a hypothetical individual of Plaintiff's age,
education, and work experience with the following work limitations:  [L]imited to no
more than light work; no more than occasional push, pull, reach, handle, or feel with the
dominant right upper extremity; frequent push, pull, reach, handle, or feel on the left;
occasional overhead reach; occasional crawling; occasional ladders, ropes, or scaffolds;
[and] occasional vibration.  (Id. at 50.)  The VE responded that the hypothetical
individual could not perform Plaintiff's past work.  (Id.)  She testified that the individual
could perform light unskilled work such as a bakery worker or furniture retail clerk.  (Id.
at 50.)  She also stated that the hypothetical person would be unemployable if she were
"off-task" fifteen percent of the time.  (Id. at 51.)  The VE continued that a person who
could only work four hours a day would not be able to perform the jobs she had identified
or any full-time work.  (Id. at 51.)

### C.      ALJ's Decision

On October 11, 2018, the ALJ issued a decision finding that Barbara L. was not
disabled.  (Id. at 19-27.)  Judge Greenberg determined that Plaintiff had not engaged in
substantial gainful activity since August 15, 2014, her alleged onset date.  (Id. at 21.)  He
found that Barbara L. had severe impairments of degenerative disc disease and
myofascial pain.  (Id.)  He also found that, singly or in combination, Plaintiff did not have
impairments that met or medically equaled a listed impairment.  (Id. at 23.)  The ALJ
further determined that Barbara L. had the residual functional capacity ("RFC")[10] to
perform light work except she was limited to pushing, pulling, reaching, handling, and

---

[10] Residual functional capacity is "the most you can still do despite your limitations."  See 20 C.F.R. §
416.945(a)(1) (2019).

12

feeling occasionally with the right upper extremity and frequently with the left; occasional bilateral overhead reaching; and occasional crawling and climbing of ladders, ropes, or scaffolds.  (Id. at 23.)  The ALJ concluded that Plaintiff could not perform any of her past relevant work but could perform the requirements of representative occupations such as a furniture rental clerk and bakery worker.  (Id. at 26-27.)

## II.    LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment

that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of proving he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

   The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 416.920.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled. 20 C.F.R. § 416.920(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 416.920(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 416.920(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 416.920(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 416.920(g).  If the Commissioner meets this

burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

### III.   DISCUSSION

Plaintiff argues that the ALJ failed to properly consider the medical opinions in the record.  (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 8-10, ECF No. 11.)  She contends that "multiple physicians who have examined and treated [P]laintiff have concluded that she has significantly greater limitations than those found by the ALJ."  (Id. at 9.)  Although she does not refer to any of these physicians by name, her argument clearly rests on the opinions of Dr. Power, a treating physician, and Dr. Zardouz, an examining physician.

Using language mirroring Dr. Power's April 4, 2016 opinion, Barbara L. maintains that she was given a "modified work status of four hours per day, with limited pushing, pulling, and grasping with her right hand, and keyboarding limited to four hours per day with the avoidance of prolonged neck flexion, extension or twisting."  (Id.; see also Admin. R. 445, 491, 897, ECF No. 8.)  Correspondingly, Dr. Zardouz opined that Plaintiff should be precluded from neck flexion for more than four hours in an eight-hour shift.  (See id. at 708-09.)  Plaintiff argues that the ALJ improperly rejected these medical opinions, resulting in the presentation of an incomplete hypothetical question to the VE.  (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 10-11, ECF No. 11.)  The Commissioner responds that the ALJ reasonably resolved conflicts between the medical source opinions and that substantial evidence supports the ALJ's evaluation of the medical evidence.  (Def.'s Opp'n 5-9, ECF No. 14.)

19cv2154-RBB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        In determining whether a claimant is disabled, the ALJ must evaluate all medical opinions he receives.  20 C.F.R. § 404.1527(c) (2019).[11]  Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  Id. § 404.1527(a)(1).  Generally, more weight is given to the opinions of treating sources than of nontreating sources.  Id. § 404.1527(c)(2); see also Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with" other evidence in the record, the ALJ will give it controlling weight.  20 C.F.R. § 404.1527(c)(2).  If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ will consider the following factors when deciding the weight to give to any medical opinion:  length of the treatment relationship and the frequency of examination, and whether the physician has "obtained a longitudinal picture" of the claimant's impairment; the nature and extent of the treatment relationship, and whether the treating source has "reasonable knowledge" of the claimant's impairment; supportability of the medical opinion; consistency of the opinion with the record as a whole; the physician's specialization; and other factors.  Id., § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).  A finding that a treating physician's medical opinion should not be accorded "controlling weight" does not mean that the opinion is rejected.  Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  Id. at 632.

---

[11] The evaluation of opinion evidence is set forth in 20 C.F.R. § 404.1527(c)(2) for claims, such as Plaintiff's, filed before March 27, 2017.  For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.  See 20 C.F.R. §§ 404.1527, 404.1520c (2019).

1    If the treating doctor's opinion is not contradicted by another physician's opinion,

2    the ALJ may reject it by articulating "clear and convincing" reasons supported by

3    substantial evidence in the record.  Id.; see also Thomas v. Barnhart, 278 F.3d 947, 957

4    (9th Cir. 2002).  On the other hand, if the treating physician's opinion is contradicted, the

5    ALJ must provide" specific and legitimate reasons" to disregard the opinion of the

6    treating physician.  Ford v. Saul, 950 F.3d 1141,1154 (9th Cir. 2020); Batson v. Comm'r

7    of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).  As is the case with a treating

8    physician, the ALJ may reject the uncontradicted opinion of an examining physician by

9    providing "clear and convincing" reasons.  Lester, 81 F.3d at 830 (citation omitted).

10   Similarly, the opinion of an examining doctor, if contradicted by another physician, may

11   be rejected for specific and legitimate reasons supported by substantial evidence in the

12   record.  Id. at 830-31 (citation omitted).

13       Drs. Power and Zardouz both found neck flexion limitations, and Dr. Power

14   recommended, among other restrictions, no overhead work, a four-hour workday, and

15   other prolonged neck posture limitations.  (See Admin. R. 491, 708-09, 897, ECF No. 8.)

16   Their opinions were contradicted by examining physician Dr. Milling and state agency

17   physicians Drs. Ombres and Ross, whose opinions did not include such limitations.  (See

18   id. at 63-67, 79-82, 877, 897.)  Because the opinions of Dr. Power and Dr. Zardouz were

19   contradicted, ALJ Greenberg was required to articulate specific and legitimate reasons to

20   reject their opinions based on substantial evidence in the record.  Ford, 950 F.3d at 1154;

21   Batson, 359 F.3d at 1195.  The ALJ stated the following with respect to Dr. Zardouz's

22   opinion:

23       Later that month [October 2015], [Plaintiff] reported a recurrence of sharp
         neck pain and occasional headaches.  (Citation omitted.)  A neurologist [Dr.
24       Zardouz] precluded her from neck flexion for more than four hours in an
         eight hour shift.  [Admin. R. 708, ECF No. 8.]  This opinion is given partial
25       weight, as it appears consistent with her neck problems at that time, but does
         not reflect the condition of her neck over a consecutive 12-month period,
26

27
28

1
2

which as discussed below, appears to have significantly improved over time
with treatment.

3
4

(Id. at 24.)  The ALJ both gave "significant weight" to Dr. Milling's opinion and

5

proceeded to qualify the doctor's conclusions:

6
7
8
9
10
11
12
13

> In March 2017[,] an orthopedic evaluation was conducted for
> [Plaintiff's] worker's compensation claim.  [Plaintiff] underwent a physical
> examination and her medical history was reviewed.  On the basis of these,
> the examining physician, Dr. Milling, opined that the claimant should avoid
> repeated forceful grasping, twisting, and torqueing with the right upper
> extremity; and should avoid repetitive or sustained work above shoulder
> level for the neck.  [Citation omitted.]  This opinion is given significant
> weight, as it is based on a physical examination of the claimant, and is
> consistent with her history of problems with the right upper extremity,
> including two surgeries.  Subsequent records (discussed below) indicate that
> the claimant experienced improvement in these areas, which suggests she
> became less functionally limited than opined by Dr. Milling.

14

(Id. at 25.)  Notably, the ALJ's decision contains no mention of Dr. Power's opinion.

15
16

"Where an ALJ does not explicitly reject a medical opinion or set forth specific,

17

legitimate reasons for crediting one medical opinion over another, he errs."  Garrison,

18

759 F.3d at 1012.  ALJ Greenberg failed to address Dr. Power's opinion even though the

19

opinion of a treating physician is entitled to deference.  See Lester, 81 F.3d at 830.  And

20

because the ALJ ignored Dr. Power's opinion, he failed to comply with the regulations,

21

which require the ALJ to evaluate all medical opinion evidence he receives, and failed to

22

analyze the factors set forth in 20 C.F.R. § 404.1527(c).  See 20 C.F.R. § 404.1527(c).

23

Without this evaluation, the Court is unable to determine whether the ALJ properly

24

weighed the opinion evidence.

25

Moreover, the ALJ did not articulate specific and legitimate reasons to discount

26

Dr. Zardouz's opinion.  The ALJ's basis for giving Dr. Zardouz's opinion only "partial

27

weight" was that Plaintiff's neck condition appeared to have "significantly improved over

28

time with treatment." (Admin. R. 24, ECF No. 8.)  The evidence cited by the ALJ, however, does not support his interpretation of the medical record.  For example, to support his statement that Plaintiff's neck condition improved over time, the ALJ states that an examination of Plaintiff in June 2017 showed "mildly positive cervical distraction" and "normal range of motion."  (Id.)  But the ALJ's citation to the record refers to a summary prepared by Athens Managed Care, an administrator for Plaintiff's worker's compensation carrier, of Plaintiff's past medical treatment and not to an examination conducted in June 2017.  (See id. at 1136-37.)  The purpose of Athens's report was to review the treatment recommended by Dr. Ghandehari, the pain management specialist consulted by Plaintiff the month before, in May 2017, for "medical necessity and appropriateness."  (See id. at 1136.)  Dr. Ghandehari's physical examination of Plaintiff did not show normal range of motion; to the contrary, the physician found that Barbara L.'s cervical flexion and extension were decreased and that she had tenderness to palpation along the C7 spinous process.  (See id. at 1005.)  Thus, the ALJ's representation of Plaintiff's neck condition in June 2017 is erroneous and not based on substantial evidence.

ALJ Greenberg also refers to a medical note from August 2017 reflecting normal cervical range of motion and "normal sensation to light touch throughout" to support his finding that Barbara L.'s neck condition improved over time.  (Id. at 25 (citing id. at 1581).)  He ignores, however, that this note was made during the course of an emergency room visit to rule out appendicitis.  (Id. at 1578.)  This visit had nothing to do with Plaintiff's neck condition and thus also does not constitute substantial evidence supporting the ALJ's determination that Plaintiff's neck condition improved over time.  Arguably, Barbara L.'s neck condition during that time frame is better reflected in Dr. Ghandehari's records from August and September 2017, in which the physician noted Plaintiff's complaints of cervical radicular symptoms that caused "constant dull achy

1    pain" on a level of seven out of ten and that was worse with neck flexion.  (See id. at

2    1049-50, 1148-49.)

3            To further support his contention that Plaintiff's condition improved over time,

4    Judge Greenberg referred to Barbara L.'s visit to her Kaiser physician in March 2018 and

5    emphasized that Plaintiff denied arm pain, numbness, or weakness.  (See id. at 25.)

6    Although the ALJ adequately described the treatment note, the absence of these

7    symptoms does not support a conclusion that Plaintiff's neck condition had improved.

8    Indeed, Plaintiff complained of neck pain during this visit.  (See id. at 1699.)  The ALJ

9    also observed that there were no records reflecting neck complaints or treatment after

10   March 2018, leading him to surmise that her condition had substantially improved.  (Id.

11   at 25.)  The Court, however, is not persuaded that this is substantial evidence to draw this

12   conclusion.  Given that her administrative hearing was held just two months later in May

13   2018, it is unclear whether Plaintiff indeed received no further treatment for her neck

14   after March 2018 or if the administrative record had already been fully compiled by that

15   time.

16           The records upon which the ALJ relied to support his finding that Plaintiff's neck

17   condition significantly improved over time, which he in turn relied on to discount Dr.

18   Zardouz's opinion, does not constitute evidence that "a reasonable mind might accept as

19   adequate to support a conclusion" and thus is not substantial evidence.  See Sandgathe,

20   108 F.3d at 980.  Furthermore, an ALJ errs when he fails to set forth specific, legitimate

21   reasons for crediting one medical opinion over another.  Garrison, 759 F.3d at 1012.  ALJ

22   Greenberg placed more weight on Dr. Milling's opinion than Dr. Zardouz's opinion in

23   part because Dr. Milling physically examined Plaintiff and reviewed her medical history.

24   (See Admin. R. 25, ECF No. 8.)  In doing so, he apparently failed to recognize that Dr.

25   Zardouz also conducted a physical examination of Barbara L. and engaged in an

26   extensive review of her medical records.  (See id. at 683-711.)  And while the ALJ

27

28

correctly observed that Dr. Milling's opinion was consistent with her history of problems with her right upper extremity, including her two surgeries, this does not constitute a legitimate reason to credit Dr. Milling's opinion over Dr. Zardouz's with respect to Plaintiff's neck condition.

In sum, the ALJ in this case erred by ignoring treating physician Dr. Power's opinion, by failing to articulate legitimate reasons supported by substantial evidence to discount the opinion of examining physician Dr. Zardouz, and by providing insufficient legitimate reasons to give more weight to Dr. Milling's opinion.  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  The Court remands this case for the ALJ to provide due consideration to the opinions of Drs. Power and Zardouz.  If the ALJ modifies Plaintiff's RFC after duly considering these opinions, he shall determine whether it is necessary to present an updated hypothetical question to the VE.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment, reversal or remand is **GRANTED**; Defendant's cross-motion for summary judgment is **DENIED**; and the case is **REMANDED** for further proceedings.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  October 19, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

21

19cv2154-RBB